310-039, in re of the marriage of Earl E. Lichtenauer, appellant by Mark Anderson, v. Joanne Lichtenauer, appellate by Raymond McSweeney. Counselor, you may proceed. Good morning, Your Honor. Good morning. My name is Mark Anderson, and I represent Earl Lichtenauer, who we refer to as Bud Lichtenauer. He's the appellate in this matter, and we're seeking to reverse the decision of the trial court as it relates to the amount of maintenance that was awarded to the appellee, Ms. Joanne Lichtenauer. Essentially, the basis of the appeal is that the trial court correctly stated in its ruling that Illinois law does not require an individual to invest in a startup company or the like, and yet imputed income to my client as a result of his failure to do so. The figure that the court utilized to impute to Mr. Lichtenauer was also based on information that the court had previously and correctly deemed hearsay, and there was no other information that was available to it for it to utilize and find such that Mr. Lichtenauer would be making that amount of money. Finally, we believe that the trial court, by using this figure, granted the appellee more maintenance than Mr. Lichtenauer's income can support, and was also excessive in that it was twice as much as the appellee's stated needs. Facts, I don't think, are too much in dispute. The parties began a divorce proceeding in 2005 in Will County. During that period of time, Mr. Lichtenauer was a owner, along with other individuals, of a company named Cipher, C-I-P-H-E-R. There was some dispute. The company was then sold, and money was placed in a trust pursuant to the court order in Will County. In early 2006, a company was formed by the name of Correct Elector. In late 2006, the money that was previously held by the court was distributed to Mr. Lichtenauer. It was August of 2006. Shortly before the trial in late 2007, Ms. Lichtenauer dismissed her petition. The case was refiled here in the South County. In the court's ruling in November 2009, the court correctly stated that Mr. Lichtenauer did not have a responsibility to invest in this Correct Electric, where some of his former business partners, as well as his paramour, all worked together to establish his company. The court said specifically, did he have to do this? The answer was no. He did not have the responsibility to invest in a company that was in its initial stages, and was just forming itself during the period of time that he was in litigation. An important fact there that was undisputed at trial is that he did not have the means in which to invest in this company because the money that he would have used was being held in trust. Although it said that he didn't have an obligation, the court later said that the court was going to find that he did have an ability to earn more in that he had passed up an opportunity and essentially gave the opportunity to his paramour so she could have it. Again, there was no facts to support that. It was just some assumptions and some conjecture saying that he couldn't, his paramour did, and so therefore he should be held responsible for the income that she was making had he invested. He thought it was contrived, the presidency of the company. Pardon me? It was contrived, that's what he thought. I think that there was absolutely some conjecture there that this was a plan whereby the paramour of Mr. Lichtenauer, here you go and you be the president and I'll just be an employee. Absolutely, that that was what the court thought. Again, my position is that there's absolutely no evidence to that. It's just pure conjecture and speculation on the part of the court. It was a conjecture of circumstantial evidence. I would say conjecture. I don't believe there was any evidence to the contrary. I mean, it shows because there was no assumptions or no evidence that even if Mr. Lichtenauer had the ability to invest in this corporation that he would have been the president. She was only one of eight shareholders and there was no evidence to show what any of these other shareholders would have thought of Mr. Lichtenauer being in place of her. I mean, he was making $50,000 then he went to an early retirement and started a consulting business and the main client's corporation, that's what the trial judge found, right? Are you talking about the Schitt case? Yeah, I mean, you know. Because in this case, Mr. Lichtenauer is making approximately $71,000, which is the prevailing... The case the judge was comparing, I guess. Yeah, and again, I think those are completely two different fact patterns. In the Schmitt case, the gentleman was a... That's Ruth Schmitt's case the judge was talking about. Exactly, and that gentleman was making $50,000 for a not-for-profit organization, retired at 50-something, was making then $5,000 as a consultant essentially to train his successors. Went from $50,000 to $5,000 on an early retirement. Here, Mr. Lichtenauer... I mean, the reason I'm asking this question... So the trial judge was comparing his case, your case, with the Schmitt case and saying it was making that comparison? Absolutely. And again, I think the fact shows that they're not alike at all. Mr. Lichtenauer, on average, for the five years previous to the court making its decision here, was averaging $74,000 a year. His current income at the time that he... at the decision was $71,000. There wasn't this precipitous drop of 90% from $50,000 to $5,000 in an obvious attempt to eliminate his ability to pay. The court also relied on Morse, I believe that was the name of the case, where again, the gentleman was in an attempt to avoid making his obligations to maintenance. He just quit and basically gutted any economic means that he had to support his maintenance obligations. This isn't that case at all. This gentleman was making $74,000 on average, and at the time of trial he was making at or about that same amount. It wasn't any sort of precipitous drop. But the girlfriend, who I guess was placed there, making $120,000. Well, that's what the court determined. Again, I would argue... I mean, his finding was $120,000. Based upon hearsay of evidence, yes. That's what he said. But again, I just don't see how the lead can be made that because she's making this, that's what he was making. And more importantly, what we're saying then is that he had an obligation to take this opportunity that was presented to him back in early 2006. The facts will show, and did show at trial, that any money he had at the time of the formation of this company was locked in Will Connolly. He didn't have the ability at that point in time. He did have the intention. Well, if he didn't have the ability, how could he loan her $30,000 on... August? September 29th. And on that same day, I think that was the date, on that same day she contributes to Correct Electric. And that same amount of money. Can't the trial court connect the dots there? Yes, but I think the timeline's important. Again, the company was incorporated March, May of 2006. I might be off. It's one of those M's. But regardless, the money was not released to Mr. Lichtenauer until August of 2006. He did loan her money, but that was after the incorporation had already taken place, shares had been issued, and this was the final payment of the 11 shares, remaining 11 out of her 32. And that shareholder agreement was also introduced as Respondent's Exhibit No. 6. Yes. And that showed that Monk did not have to run it by the other shareholders if she wanted to transfer her interest to her boyfriend. That's true. So why can't the trial court connect the dots and find that this was a little suspicious? And again, I'm not suggesting that there aren't questions in relationship to how this all plays out. But the point is that there's no evidence available to the court to be speculating as to how this works because there's nothing to say that if Budd would have invested, she would have been in the present. There was nothing there, or that he would have made $120,000. I guess where's the obligation is what we're saying. If an opportunity presents itself to an individual in Mr. Lichtenauer's position, where is it in the law that says he has to take it? If an opportunity presents itself. The judge didn't hold him to that standard. The judge said, you don't have to take this opportunity. But then there's another chapter to this story. He laid the groundwork before so he could just walk right in after the dissolution. And certainly, though, but... Murrow testified he did not invest because his attorney told him not to. That's true. And that's reasonable advice. He did invest. Yeah, during the pendency of divorce. Let me ask you, could the trial judge have made the maintenance reviewable? I think any maintenance is, I think, reviewable in the sense that upon a change in circumstances... So what, two years later, his suspicion has come to fruition, and your client is making $120,000 significantly more, he can adjust the maintenance at that time, right? That's, I was getting there, but yes, that's exactly what I'm saying. The protection afforded that if this, again, nefarious plot was there to deprive the marital estate of something that it might have had, that it's always going to be there. If Mr. Lichtenauer's income changes, it lowers, he can come to the court and say, listen, I need some help here, I don't have the ability to do this. Likewise, if his income went to $120,000. I mean, the reason the trial judge, I guess, pointed out the Morrison-Smith case is because he thought this case was analogous. Yeah, and I, with all due respect. And fitting those two cases in, he felt it was justified in making the determination he made, connecting the dots, as they say. Yes, but I guess I would respectfully, again, disagree though, because both those cases where a guy did something, a bad act, essentially to say, I don't have any money, see? I take whatever I have, I've thrown it to the side, and now you can't hold me responsible. He didn't deprive the marital estate. This is the same money he's made. Essentially, it would be no, my analogy would be if he was working at the company, $50,000, a headhunter calls him up and says, listen, I can get you a company over here that will pay you 80. He says, no thanks, I'm good here. He was an owner, a partial owner of a company, and chose not to then become an owner of another company for all sorts of reasons. And I don't think, again, that the law imputes that obligation on him to every time he sees an opportunity, that he has to try it. No differently than the money that Ms. Licht and I received as a result of the sale of Cipher Electric, that she had an obligation to go and seek opportunities. There was no guarantees here. I think that was another assumption, that somehow this company was going to be an ongoing concern and very successful. It was speculative at best at that period of time. And I think, quite frankly, the difference between these two cases and the case at Barker is that the marital estate wasn't deprived of anything that it didn't already have. It wasn't like he was making the $50,000, went down to $5,000, and the court said, no, no, no, you're not going to get away with it. He was making $70,000-ish, he's still making $70,000-ish. What he didn't do was invest in the company because, A, he didn't have the means to, B, he was told not to, and most importantly, I think he didn't have an obligation to. And the girlfriend can sell the stock that she has to the husband without first offering it to any other shareholders, right? I think that's a correct statement of what the shareholders' agreement says. Or she could gift it to him. Absolutely. And in the event that his income increased as a result of that act, Ms. Licht and I would have the ability to come to court and seek an increase because his ability to pay would be there. Can she unilaterally make him president of the company and increase his salary? I do not believe that the shareholders' agreement has any language to that effect. My inclination is absolutely no. There was nothing in it. It was all about, I have it here, but not quite as. I believe it was just a transferring of the shares. What experience does the girlfriend have in an electrical contracting company? Well, again, the only testimony, nobody from Correct Electric was called to testify. Ms. Moth wasn't called to testify. The only testimony was that of Mr. Lichtenauer, who, when asked in response to counsel's questions, was that she had been an event planner beforehand. So if you're asking me if she had previous electrical contracting experience, the answer is no. So as long as they're on good terms and living together, why would he need to be president if there's 120,000 hours coming into that household for her? Well, assuming, again, that he would have the right to be president. I mean, again, I think there's some more supposition there that somehow it's his decision whether he ascends to the throne or not of this company. And there's nothing in the record that says that. What it says is that she has the right to transfer the shares, and I believe for value, without first having to offer them to the other company. But, you know, in theory, you may be right. As long as they're getting along, it's a good arrangement. Absolutely, but there's nothing to say. And, I mean, again, the other thing was there was none of his money that was used to purchase it. There was a loan there, but it was for value, 7.5 percent return paid, promissory note, everything. And it was done after, again, all the shares had been issued. She had a remaining balance due and owing on the 32 she purchased, and that's what that was for, long after the incorporation. Didn't Baum sign his loan, Correct Electric, $270,000 that really hasn't shown up anywhere? Again, there was testimony to that fact that during the initial incorporation of Correct Electric, money was loaned from Baum signed to Correct Electric and repaid. The testimony of Mr. Lichtenauer at that time was he really didn't have too much to do with Correct Electric. There was another individual receiving Baum. The money that Baum was repaid, what happened to that $270,000? Has that shown up anywhere? My recollection is that it was repaid, and then Baum signs was sold, and the proceeds were value, and the proceeds of that say were divided in this proceeding as well, which is not at issue. That's my time or not. Counselor, you have one minute. Okay. I think we touched on the- We're not that fast. Okay. The income figures I said, the $120,000, really came in after counsel had tried to elicit this testimony or evidence using W-2s and what have you to Mr. Lichtenauer, who at one point in time said, I think so. That was the only information that the court had available to it of how much Ms. Malk made. Again, she didn't testify. No information was produced. I objected as a hearsay. The court correctly ruled that it was. And so how the court could then use $120,000 as a figure to impute upon Mr. Lichtenauer, I think, is inappropriate. And lastly, I don't mean to rush, but I think I have to here. When it comes to the actual amount, the appellee's stated needs, the court determined them to be somewhere in the neighborhood of $2,200, $2,250. Excuse me. Her income, $2,250. The amount of needs was $3,200. A deficiency of $950. And then the court gave her $1,850 on a monthly basis. Again, given the fact that the income was imputed, we believe, incorrectly and also excessively based upon her needs. Unless the court has any other questions. You agree that this is a dissipation case. I mean, there's one of the cases you're citing that's about dissipation, but really this isn't. No, dissipation wasn't an issue. I know there was some conversation during the briefs and at court about what he did with his money. But quite frankly, that's irrelevant in the fact that there wasn't any dissipation that was claimed by the party. Thank you very much. Morning, Your Honors. Just a minute. My name is Raymond Skeen. I represent Joanne Lichtenauer, as I did at the trial court level. She is the respondent in this case. Did the trial judge pull this $120 out of a hearsay statement? Judge, I believe in, I'm sorry. Your Honor, I believe in my supplemental statement of facts. I quoted the specific question and answer. And the objection came after the answer was given. And there was further discussion. But Mr. Lichtenauer did acknowledge, I believe his answer was, I believe so, that she made $120,000. And if you... What does the judge do with the objection? Do they sustain it or remove it? That question and that answer was not objected to. I later continued and was asking questions like, you live with her, you don't know what she makes, you know, you started this company, blah, blah, blah, down the road. And after that, there was another objection, which was eventually sustained. But the specific question and the specific answer that I cite in my supplemental statement of facts was not objected to. Does that address the court's question? If I might, if I could start out by pointing out what I think is sort of a fatal flaw to one of the central arguments of Mr. Lichtenauer. Both in his brief and specifically at length in his reply brief, he complains or states that Mr. Lichtenauer was somehow prevented from investing in this company. And I think that statement and that position is so far afield from the facts in this case that I feel it's important to discuss it at some length. First of all, Mr. Lichtenauer, at the time that Baum signs the loan of $270,000 that Justice Frey was talking about, was a 50% owner in that company. And to say that he wasn't involved, I mean, he has a controlling interest in that company. Nothing can happen if he doesn't want it to happen. And to say that he didn't have any money to invest in that company when a company that he owned at the relevant time gave $270,000, loaned $270,000 to this new startup, I think is, I think the discussion should end there. But further, he also says he didn't have any money to invest in the company. Yet he acknowledges he loaned the very money that his paramour used to invest in the company to her. Additionally... Is the timing of that relevant? In other words, the shares have already been sold? Well, I think what's relevant is when the capital comes in. I mean, these are all people that worked... Maybe I should start at the beginning. The predecessor company, after the original divorce was filed in Will County, Mr. Lichtenauer, kind of analogous to the second case that the trial court cited, the Morse case, instituted a dissolution of that company. He received bond signs and money. He and his partner, Mr. Alfie. They received the right to employ certain people. Those people, with the exception of his paramour and one other individual, are the people that invest in this new company. The company that he retained gave all the money to the new company that Mr. Lichtenauer chose not to invest in so that it could start up, become operable, and as capital calls came in, he loaned his paramour the money to put into the company. Now, to say that you don't have the money when those are the facts, I think is disingenuous. In addition, just because... Was his money tied up by a court order? There was an injunctive order entered when the business dissolution in the Will County case, when the business dissolution began, the predecessor company business dissolution. But that doesn't mean that Mr. Lichtenauer couldn't have made an application to the court and said, Hey, you know, we settled this dispute. We have this $256,000. I would like, you know, $90,000 so I can invest in this company. What was the purpose of tying the money up, of locking it up at one point? Well, to be completely frank with you, Your Honor, I was not involved in that case at that time. In kind of a weird twist of things, I got involved in that case later when my father retired. But presumably, as just a common-sense divorce lawyer, when you've got, you know, hundreds of thousands of dollars coming your way in a messy divorce case, common sense would require that you ask the court to hold onto it until we work something out or somebody decides they want some money. And to say I couldn't get it because she prevented me, he didn't say I asked and she fought me. He just said I couldn't do it. And, again, I think that's disingenuous. Was that by agreement that the funds were held because there was other property distribution, if I'm not mistaken, in Will County, by agreement? To be completely frank, that, I believe, is outside of the record in this case, and I don't know the answer to that question. I don't know if, as often happens, you know, people just agree to those things without prejudice or whatever. I just don't know the answer to that question. And it didn't get in this record? I don't believe it did, Your Honor. You mean all the details about the Will County? Well, there were certain... Shucked out in the record. That's true. There were certain, the disbursement orders, those two orders, I believe, came in when the money was released, and they were by agreement. And I was involved, at least, yeah, I think I was involved with both of those orders. Okay, thank you. So, at any rate, I think the entire... We have that documentation as part of this record. And the court relied on it, I believe. Yes. Specifically, I think it was, there were two court orders from Will County that we constipated to and were entered as exhibits, I believe. Those are the disbursement orders. Yes, the $10,000 each for CDs, $100,000 each, and then there was a final distribution. In addition, when they sold their Merrill residence, I believe that order came in. And there was quite a bit of testimony and argument about that. I would like to talk a little bit about the court's analysis. And specifically, it's relied on the Smith case, which I think is entirely appropriate. And I think that it's pretty, I mean, it's obviously not four corners accurate, but to be completely blunt, I think that the facts in this case are actually more compelling than the facts in the Smith case. In that case, a gentleman voluntarily retired and went from making $50,000 a year in 1979 dollars to $5,000 a year. And he significantly decreased his income. And he went off to live with his parents in a farm, presumably in an inexpensive way. Now, you know, it seems to me that we have a very similar situation here. Mr. Lithenauer. Your opponent appears to argue that, look, his actual income, salary, didn't really radically change, which is in contrast to the Smith or the Morris case, right? Well, also though, $70,000, right? By the time we got to the trial in this cause, this had happened, and he was making $70,000 since he worked at Corrective Life in 2006. Okay. But prior to that, I believe the four tax returns in evidence, his average income for the three years prior to the initiation of any divorce proceeding, either here in this county or in the previous one in Will, his average income was $120,000. And so I do think there's a difference. And the other thing that's interesting to me is that, as Justice Wright sort of talked about a little bit, he, of course, you know, has a decent income, but his paramour, who he lives with, has a significant income, and it seems completely reasonable in the trial court to wonder, and in fact, in his decision, I think he recited specific examples of things that he thought were a little quirky, one of which is, you know, that she has no experience running a business of this nature. He gives her the money to invest in it, and then she draws a salary. And what she brought to the table, I think he said, you know, I can't determine, but I think he found it suspicious, and I think he found it suspicious as rightly so. Now, your opponent suggests that's just pure speculation and conjecture, and not grounded on either proper inferences, circumstantial evidence, or... Well, I think that there's a large amount of circumstantial evidence of all the strange things that were happening, and I think in this decision, the trial court kind of went through them, and I'm more than happy to do it as well, because if you go through the Smith analogy, what we're really talking about here is the motive of Mr. Lichtenauer, and also the timing of this stuff. As I previously indicated, you know, litigation in Locali was initiated before he initiated the predecessor business dissolution, okay? And then, following that dissolution, you know, the lawyer that represented him in that dissolution wrote some articles of incorporation and named him as a director, and he was sending that information to Mr. Lichtenauer. Now, that's, to me, significant circumstantial evidence of his motive, and he said, you know, it was a mistake that I was on there. Although he's employing this man, right? Not his paramour. And then, you know, it simply continued. There's a specific benefit, not that he owns it, but he's mentioned in the articles, I'm sorry, in the shareholder agreement, I mean, the benefit is given to his paramour, but it's for the benefit of him and her, presumably. They've lived together this entire time, you know, three years before this divorce happened, and while these things are being negotiated, you know, and his testimony was not candid. And, in fact, it didn't become candid until the very end of the case, when the trial court asked some pointed questions. And in his decision, I think he points it out, he said in his decision, I think it's pretty clear from the testimony and proceedings in this particular case that the opportunity was there, referring to the business opportunity. I think Mr. Lutendow was candid in his testimony mostly. I think that came when I started asking him some questions as to why he did or did not proceed. And so, you know, when I was asking him questions initially, he said I didn't do it because I couldn't invest. And then when the $30,000 shows up on the same day that a capital contribution and all of this starts to come out, and he gets a day to think about how am I going to solve the $30,000 problem, and he comes back the next day with an undisclosed note that he loaned this money to his paramour. And then the court, I assume in some frustration, said, you know, asked some direct questions to the gentleman, and he said I was advised not to do it. And the court properly determined that, you know, that's okay, you can do that. But that's not the end of the story, right? Now we have this other analysis. So why is he doing these things? Why are these benefits that, you know, and he's living with this person and presumably, you know, sharing the benefits of her income. Thank you. And, you know, in the totality of it, all of those things line up. I mean, we have the corporate attorney, a five-month appearance for Mr. Lutendow in this case. We have him being on the articles of the corporation. We have the specific benefit. We have drafts being sent to him. We have all these employees of a company he owns, Baumsteins, working for Correct without compensation to him. We have the loan of money between Mr. Lutendow and his paramour. And he finally gave it up. But all of that, I mean, shows what he was trying to do. He wanted to receive the fruits of the benefit of this new corporation without having an ownership interest. And so I think that the Smith and the Morse cases are an appropriate, equitable way to, you know, address the strategy that he took. And I think it's interesting, I had a different view, that specifically the trial court judge didn't comment on whether or not that was an appropriate or inappropriate strategy. He just said, okay, this is what he did. He didn't hit him over the head with a hammer because he thought he was a bad guy. He just said, okay, this is what he's done. He's chosen not to take this opportunity. Yet it's obvious that he avails himself of the fruits of this company. And so I think that the Smith and the Morse analysis is what he ought to do. Because he's clearly in good health. He's at an age where he should continue to be working. And he, you know, I think he's adopted this strategy as a way to minimize his maintenance obligation. The last thing I'd like to say, if I might, is in response to a question that you, Justice Smith, asked. Couldn't the court have made this reviewable? And if it turns out that later in time this transfer happens, then we can come back. Well, there's a couple problems with that, I think. The first is, how would she ever know? There's no possible, I mean, we're going to get a notice in the mail that there's been a transfer in a private company. We're never going to find out. How is 30%? Okay. The second part is, if that's what happened, then all they have to do is never do it. And they're still living in the same house and still have $170,000 in income. And so that's perfect. I got a low maintenance award, and I got all the two of them have all this money. And why would you ever do it? Well, you know, that fits the day when they're not getting along, right? Well, sometimes honeymoons end even between non-married people, right? And so if she decides to find somebody she likes better, she'd take her $120,000 salary, whatever it is she's making, and bring them out and bring somebody else in. That's exactly true. And if that were the scenario, then he's protected, right? Because then he has the ability to say, hey, I got fired from my job. My girlfriend kicked me out of the house. I got to go find a new job, and I can't pay that anymore. So he files his petition to reduce maintenance on a substantial change of circumstances. He comes to court, gets his new job, and the maintenance is reset. Let me ask you one last quick question, since we're out of time here. You mentioned a minute ago, you talked about three years before 2005, his average salary was about $100,000. And I say my notes, I want to see if I can make sure, show 2003 about $100,000, 2004 about $95,000, and 2005 about $77,000, give or take. I know that in my brief, I cited that specifically with... So the notes in your brief would be accurate? I'm sure I cited the record specifically, and those returns did come in, and I believe the average was $120,000, as I stated, in those years. The three years prior to the original litigation commencing in 2005. So I think I was discussing, and I might have not said this, two, three, and four, but as I said, I'm not sure what page it's on. Okay. Thank you very much. Is there anything else? No, thank you, counsel. Thank you very much. Counsel? Thank you again. As long as you were talking about the income, the tax returns are in there. And with respect to the salary, and that's what I was referring to, the five years average up until that point was around $74,000. In 2003, the salary was $93,000. In 2002, it was $99,000. There were capital gains, significant capital gains in a couple of years that were from the sale of property and things of that nature, and it was actually a loss one year where we ended up netting like $54,000. So I was talking about salary alone. Those numbers are correct, and it was $93,000 in 2003 and $99,000 in 2002. A lot of capital gains for flipping houses and things of that nature which weren't related to employment, just for the record. As far as the loan after the incorporation, I think, Justice Wright, you had asked me earlier, I mean, I think timing, I don't know who asked that question, but timing is, I think, irrelevant there. The shares were issued, purchased, were to be delivered and payments were to be made thereafter. They had already been incorporated, set out, she owned these. He did loan her money to pay for those, which she paid back. Counsel had, again, tried painting his credibility as being something other than what it was. He was most credible with regards to this issue, and yes, there was a note that he previously, or that he brought in the next day to evidence it, but it wasn't just a note that he had gone home and printed. He brought in the actual copies of the canceled checks in which she paid him back. This wasn't a sham transaction. There was evidence that it was uncontroverted. Nobody came in and said that there was anything to the contrary. So the fact that he was assisting her in this opportunity, her opportunity at that point in time, again, I don't see the analogy to the two cases that we keep talking about. She was able to pay him back because she was making over $120,000. Apparently, yeah. And again, there's no evidence that she doesn't earn that money. The fact that she did something previously that was unrelated doesn't mean that she's not putting in a 40-hour week. There was absolutely no testimony to the contrary, that she doesn't earn this money, that she isn't there at the company every day performing a valuable service as president. I don't know if that president is. She wasn't called to testify as to what her duties were or what she did bring to the table. There's no testimony with regards to that. So again, the testimony he's quoting from is that in 2008, she made $127,604 to correct electric, right? And your client's answer was, I believe so. Yeah. And I was going to get to that, too, without taking up the little time I have here. On pages 29 to 35 of the record there, I think it was volume two, that's at length. There was objections, five or six of them. And in summary, at the end, the court does say there was no information or evidence that he had any previous knowledge of this. And Mr. McSteen said, I'll move on. So again, I don't think that that was either his previous income all the way back in 2002, 2003, when he was an owner of a company, is related. He sold the asset. The parties divided the benefits of that asset. He can't be held to be making what he was when he was an owner. The parties have already derived the benefit of that. Essentially, I think what I'm trying to say is that the law does not, as I understand it, and I would argue, does not make an obligation on him to take every business opportunity that is out there. That it would be no different if the gentleman had never worked overtime in 10 years of marriage making $70,000, and all of a sudden his boss would say, listen, if you want to come in and work some more hours, I'll pay you extra. Or you take this training program and you might be able to then make extra. And he goes, no thanks, I'm pretty good here. It doesn't take anything away from the marriage or his ability to pay like the two cases we're talking about. That's somebody who had an obligation, said you're not going to tell me what to do, and I think that was the Morse case where the guy said no court's going to tell me what I have to pay, and so I'm stepping back, and there you go. Or the guy who makes $40,000 says I'm going to go work at McDonald's. You can do that. You can go work at McDonald's. But we're going to hold you to the standard of the marriage, and that's the other thing that's key here. You know, one of the factors is what were the standard of living during the party's marriage? This was the standard of living. Five years previous, he was making $70,000. The fact that he could have an opportunity, and that's the other thing, too. There's no fact specifically that says if he were the president, he wouldn't have run the thing in the ground. Thank you. There's no evidence to all this. It is a lot of innuendo, speculation, but ultimately I don't think that the law wants to be in a position of second-guessing everyone's business acumen and whether or not they should do this or they shouldn't do that. Really, though, isn't it just a credibility determination because your client testified I had this business opportunity, and I didn't have the money to take it, and the court had to decide whether that was truthful or whether he had actually taken that business opportunity and was attempting to camouflage it. Isn't it really, within the trial court's province, to determine whether your client is telling the truth or not based on facts? Yes and no. And I'd like to start with a no first because it goes back to my whole point of let's say he did. Let's say somebody walked up and said, listen, if you invest in this business, you'll make $120,000. And he says, I've made $70,000 for the last five years. I don't want to be an owner of a company. No, thank you. Hey, Ms. Malk, you want to do it? Here's an opportunity for you. Where's the obligation in the law that says he has to do that? I don't think that he does, nor do I think that they should impugn. I agree. I agree, but the judge was deciding whether he did. That's all of a sudden. I'm sorry. The trial judge was trying to decide whether your client actually did take advantage of that business opportunity. He camouflaged it by using the stalkers. Well, and I'd say that the evidence doesn't support that, that there's a lot of, again, speculation. He didn't. He's not. I think that there was no evidence to the contrary. None of this bottom signs, loaning was ever asked of him. Why don't you take the money out of bottom signs of this, that? Uncontroverted evidence was that the money was in Will County. He was advised not to and didn't. I think that the two cases and perhaps retaliatory diminishes their income. To deprive somebody, you should impugn income back to where they were. This is what the gentleman was at for five years. The fact that whether he did or did not have opportunities to make more, in my opinion, and I've asked it to be yours, that it not be his obligation to have to do that. Because, again, I think it then gets into the point where the courts, and I think that's the conclusion, is it based only on the hearsay testimony as to the $120,000 in income? Yeah, I don't think that $120,000, there was no evidence submitted to the court to come up with that $120,000. That was purely taken, the court heard it, objected, properly objected to and sustained it, but then still used it later on as a basis for impugning his income. And it wasn't the $120,000 that the counsel talked about 2002, 2003, the court actually shouldn't have had any information as a result of not having information, couldn't impugn it, because the court shouldn't have, didn't know what they were making. But I guess, as I said, and perhaps... Well, there is, the record on page 29 that's quoted by the other side is he was asked, she makes $127,604, and his answer was, I believe so. That wasn't... And then as the court might read on, at the end he basically says, listen, there's no information to show what this guy did know. We did cite a case in there also where basically a cursory reference to an amount shouldn't be taken as good evidence. He wanted to know how much Ms. Mock made and wanted that in the record. Should have called Ms. Mock, should have called somebody from the company and not asked a guy who gives a, I believe so, but there was no definitive answer. But again, I guess I'm just looking at the law here and what the court has to do and did he have an obligation to take this opportunity to present it himself. I don't think under the law when we're looking to establish the standard of living that the parties enjoy during the course of the marriage that he did anything to deprive Ms. Lichtenauer or the Maryland state. He basically said, at worst, and again I'm not conceding that he did have an opportunity, but if he did and said, no thank you, again I don't think the law obligates him to do that. Thank you for your time. Thank you. We'll take this case under advisement and rule with dispatch.